# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                         Case No. 05-CR-145

RASHID ABDULLAH SALAHUDDIN,

    Defendant.

## RECOMMENDATION TO CHIEF JUDGE RUDOLPH T. RANDA

    The case of United States of America against Rashid Abdullah Salahuddin ("Salahuddin") has a long procedural history that is recounted in the Seventh Circuit Court of Appeals' decision remanding this case to the district court for consideration of Salahuddin's motion to suppress, and therefore this history shall not be recounted here. See United States v. Salahuddin, 509 F.3d 858 (7th Cir. 2007). Following the Court of Appeals' decision, Chief Judge Rudolph T. Randa referred the defendant's motion to suppress to this court, and on April 30, 2008, the court conducted an evidentiary hearing. A summary of the evidence adduced at the evidentiary hearing is set forth below. At the conclusion of the hearing, the court ordered the parties to submit post-hearing briefs. The pleadings on the defendant's motion to suppress are closed and the matter is ready for resolution.

**EVIDENTIARY HEARING SUMMARY**

    **Milwaukee County Sheriff Detective James Ford**

    Ford was a Milwaukee County Sheriff Detective assigned to the warrant squad in January of 2003. (Tr. 5-6.) His responsibilities included locating and arresting persons who had open warrants.

(Tr. 6.) During this period he was the lead detective assigned to investigate a person known as Willie Gray, also known as Rashid Abdullah Salahuddin, (Tr. 10), who had a felony warrant out for his arrest. (Tr. 6.) As part of his efforts to attempt to locate Willie Gray, Ford began by compiling some basic information about Willie Gray such as his last known address, next of kin, and similar information that is generally maintained by the Milwaukee County Jail. (Tr. 8.) From the jail records, Ford learned that Willie Gray's last known address was 7510 West Thurston Avenue, where he resided with his wife. (Tr. 8, 35-36.)

On January 13, 2003, at approximately 4:30 PM, Ford, along with Milwaukee County Sheriff Detectives Greg Zimmer, Scott Stiff, and Luke Chang, went to this Thurston Avenue residence. (Tr. 9.) This residence was a multiunit apartment building with a locked common lobby, and Willie Gray was believed to live in apartment number one. (Tr. 9.) Ford rang the doorbell to apartment one but received no answer. (Tr. 10.) Ford had a telephone number for the apartment and called the apartment, making contact with a woman. (Tr. 10.) Ford identified himself to this woman, who identified herself as Rose, (Tr. 11), and explained that he was looking for Willie Gray. (Tr. 10.) At Ford's request, the female came to the door. (Tr. 10-11.) On both days, the detectives wore in full uniform, described as a black military-style khaki uniform with cargo style pants, embroidered badge and patches, and a nylon gun belt. (Tr. 38-39.) All of the detectives were armed. (Tr. 39.)

Rose informed Ford that Willie Gray was not at the residence and Ford asked if they could come into the apartment to make sure he was not there. (Tr. 12.) Ford did not inform Rose that she had a right to refuse to consent. (Tr. 44-45.) Rose verbally consented to allow Ford, Chang, and Zimmer into the apartment to look for Willie Gray. (Tr. 12.) Ford did not obtain written consent from Rose; Ford described his conversation with Rose as cordial and in a normal conversational

tone and free of any threats. (Tr. 12.) Children were also present in the apartment with Rose. (Tr. 60.)

All rooms of the apartment were searched, but Ford does not recall if the basement was searched. (Tr. 44.) While searching the apartment for Willie Gray, Chang found two long guns, a 20 gauge shotgun and a .22 caliber rifle, in a bedroom closet. (Tr. 13-14.) Nearby those guns was a bag of various caliber rounds of ammunition. (Tr. 14.) In the bedroom where the firearms were found were numerous pieces of paperwork and mail in the defendant's name as well as clothing that appeared to be for a male. (Tr. 16.) These firearms and ammunition were subsequently recovered and removed by the detectives, in part, because Rose said she knew nothing about the guns, and the guns were loaded and unsecured in an area accessible to the children in the apartment. (Tr. 60, 65-66.)

Ford questioned Rose about the firearms and Rose stated that the firearms did not belong to her and they belonged to the defendant. (Tr. 14.) Rose further stated that the defendant used to live at the residence but that they were now separated. (Tr. 14-15.) Ford asked Rose if they could search the residence for additional firearms and Rose said, "No." (Tr. 16-17.) Her demeanor remained calm, cooperative, and conversational. (Tr. 17.) At this point the detectives ended their search and left the apartment with the recovered weapons and bag of ammunition. (Tr. 17, 65-66.)

Based upon the property he observed inside the residence, Ford believed that the defendant was still living at the residence, and therefore he sought and obtained permission from his supervisors to conduct surveillance on the residence. (Tr. 17.) Later that evening, Ford and other sheriff detectives began surveillance of the residence and remained at the residence throughout the night. (Tr. 18.) At approximately 7:00 AM, Rose was observed leaving the residence and Ford followed her as she dropped the children off with another person and continued to her place of work. (Tr. 19-20.) At approximately 10:30 AM, detectives conducting surveillance on the residence

observed the defendant arrive at the residence on West Thurston Avenue. (Tr. 18-20.) The defendant was observed in a car that was registered to him, and Detective Carter confirmed his identity based upon booking photographs he had with him. (Tr. 18-19.)

Detective Carter communicated to the other detective on surveillance by way of police radio that the defendant approached the door of the apartment building, took out a key, opened the door, and entered the residence. (Tr. 20.) The detectives then gathered about a block away from the residence to formulate a plan to arrest the defendant. (Tr. 20.)

At approximately 11:11 AM, Detectives Ford, Chang, Zimmer, and Stiff approached the residence, knocked on the exterior door and announced their presence. There was no response and after 25 seconds, they forced entry through the door leading into the building's common lobby. (R. 21-22.) The detectives then arrived at the door to apartment number one, knocked and announced again, and after waiting roughly 25 seconds and not receiving a response, the detectives forced entry into the apartment. (R. 22-23.) Inside the apartment the detectives identified themselves as police and defendant called out that he was in a back bedroom and he was not armed. (Tr. 23.) Ford instructed the defendant to come out of the bedroom slowly and to show his hands. (Tr. 23-24.) The defendant complied and was handcuffed by Ford. (Tr. 24.) Contemporaneously with Ford handcuffing the defendant, Ford asked the defendant if there were any weapons in the house. (Tr. 24.) Ford was concerned because the day before when the officers recovered the weapons, they also recovered 9mm ammunition but did not recover a 9mm firearm. (Tr. 24.) In response to Ford's question, Ford stated that there were two guns in a bedroom closet and indicated towards the bedroom from which the detectives had removed the firearms the day before. (Tr. 24.)

Ford did not provide the defendant with his <u>Miranda</u> warnings before asking him about the firearms. (Tr. 25.) Ford did not <u>Mirandize</u> the defendant because the question regarding weapons was a standard question asked for the purpose of ensuring the safety of the officers and the suspect.

(Tr. 25.) After taking the defendant into custody, the detectives conducted a protective sweep of the residence to ensure there were no other subjects in the residence. (Tr. 26.) The detectives then took time to make sure the defendant was able to get dressed, and then he was transported by another deputy to the sheriffs department's Criminal Investigation Bureau, which is located in downtown Milwaukee. (Tr. 26-27, 52.) The detectives were in the residence for a short period of time, perhaps twenty-minutes. (Tr. 63.)

At the Criminal Investigation Bureau the defendant was placed in an interview room, which is a room roughly six-by-eight feet with a bench. (Tr. 27.) Some of these rooms have desks but Ford does not recall if the room the defendant was placed into had a desk. (Tr. 27.) At 3:03 PM, Ford read the defendant his Miranda rights from a card; the rights Ford read from the card are the same as those reflected on the Milwaukee County Sheriff Department's standard statement of rights form, which Ford provided to the defendant to read and sign. (Tr. 27-28.) After the defendant signed the form, Ford asked him if he would answer questions. (Tr. 29.) The defendant responded that it depended upon what questions Ford asked. (Tr. 29.) The defendant wrote "Yes" next to the question of whether he understood his rights, but when it came to the question about whether he wished to make a statement, the defendant wrote a question mark. (Tr. 54.)

Ford asked the defendant about whether he lived at the residence and about his relationship with Rose. (Tr. 30-31.) He said he used to live at the Thurston Avenue address, and he is married to Rose but they were having problems. (Tr. 30-31.) When asked about the guns, the defendant said they belonged to Rose. (Tr. 31.) The defendant then said that he was not a felon in possession of firearms and that he did not want to answer any more gun questions. (Tr. 30, 32.) At this point Ford terminated the interview. (Tr. 32.) This interview was not audio or video taped. (Tr. 56.)

**Milwaukee County Deputy Sheriff Luke Chang**

At the time of the relevant events in January of 2003, Chang was a detective in the sheriff's

department assigned to the warrant squad. (Tr. 66-67.) He has since been reassigned. (Tr. 67, 88-95.)

On January 13, 2003, Chang accompanied Ford to the Thurston Avenue residence as Ford made contact with Rose inside the apartment. (Tr. 69-71.) Rose was calm as she talked to Ford about why they were there. (Tr. 71-72.) In this conversation Ford asked Rose if they could come in and Rose invited the detectives in. (Tr. 72-73.) Chang undertook a search of the residence for the defendant and while searching the closet of one of the bedrooms he found two loaded long guns. (Tr. 73-74.) Chang described this bedroom as being set up like an office with a computer and cans of what appeared to be pesticide. (Tr. 74.) He eventually picked up the guns and cleared them, removing the ammunition. (Tr. 74.) Chang's search ended upon the recovery of these firearms and he was the detective who took the firearms and ammunition out of the residence. (Tr. 75-76.)

Rose was questioned about the firearms and she stated that the firearms belonged to the defendant. (Tr. 75.) Chang described this questioning as relaxed and recalls at one point Rose discussed her service in the Army. (Tr. 76-77.)

Chang was part of the surveillance team that remained at the apartment through the night. (Tr. 78.) The following morning, after being alerted by another member of the surveillance team that the defendant had used a key and entered the building, Chang and the other deputies assembled to enter the residence. (Tr. 78-79.) Unlike their prior entry, this time the common door to the building was locked and thus the deputies forced their way through that door. (Tr. 79.) Chang does not recall if they had to similarly force open the door to the apartment, but does recall that as they entered they were identifying themselves as police. (Tr. 79.) Once inside the apartment, the defendant stated he was in another portion of the apartment and he came out. (Tr. 80.) When the defendant came out, Chang saw Ford place the defendant in custody. (Tr. 81.) Although Chang recalls Ford asking the defendant if there were firearms in the residence, Chang does not recall

-6-
Case 2:05-cr-00145-LA   Filed 06/23/08   Page 6 of 17   Document 101

when this question was asked. (Tr. 81.) In response to this question, Chang indicated towards the bedroom where the day before Chang had removed the two long guns. (Tr. 81.) Chang did not participate in the subsequent transport or interview of the defendant. (Tr. 82-87.) Chang may have stayed at the scene until the breached doors could be secured. (Tr. 83-84.)

**Milwaukee County Sheriff Sergeant Scott Stiff**

At the time of the relevant events in January of 2003, Stiff was a detective assigned to the warrant squad. (Tr. 107.) He has since been promoted. (Tr. 107.) On January 13, 2003, Stiff was part of the perimeter containment team around the apartment as other deputies attempted to make contact with the occupants of the apartment. (Tr. 108.) He did not enter the residence until after the search had been conducted, at which point he observed the two rifles in the bedroom closet. (Tr. 109.)

Stiff remained at the scene as part of the surveillance team that watched the apartment through the night. (Tr. 111-12.) The following morning, Stiff observed the defendant enter the residence using a key. (Tr. 112.) Stiff notified other units of his observation and the deputies gathered and began their efforts to enter the residence. (Tr. 112.) The team forced entry through the common door to the building and forcibly entered the defendant's apartment. (Tr. 112.) In response to the deputies identifying themselves, the defendant called out his location and stated he was not armed. (Tr. 113.) The defendant then complied with the deputies' orders and he was taken into custody. (Tr. 113.) The defendant was then asked whether there were any guns in the residence and the defendant indicated towards the bedroom. (Tr. 113.)

The defendant was transported to the Criminal Investigation Bureau where he was interviewed a few hours later. (Tr. 113-14.) Stiff was present as a witness during Ford's interview of the defendant. (Tr. 115.) Ford read the defendant his rights, and the defendant signed the form. (Tr. 116.) There were no threats or promises made to the defendant to encourage him to sign the

form. (Tr. 116.) When asked if he would answer questions, the defendant said he would first have to see what the questions were. (Tr. 117.) When asked about the firearms found in the closet, the defendant stated they belonged to Rose. (Tr. 117-18.) The defendant then ended the questioning by stating that he was not a felon in possession of firearms and that he did not want to answer any more questions. (Tr. 118.)

**Rose Salahuddin**

Rose Salahuddin ("Rose"), who was formerly known as Rose Townsend, is married to the defendant and they have two children together. (Tr. 125-26.) On January 13, 2003, she was asleep in her apartment when she received a phone call from a man asking her to come to the door. (Tr. 126-27.) She gathered her two young children, who were the only other people in the apartment, and went to the door, where she saw a police officer. (Tr. 127-28.) The officer explained that they were looking for the defendant and she responded that there was no one else in the apartment. (Tr. 128.) She backed away from the door and the officer and numerous others entered the apartment with guns drawn. (Tr. 129.) She does not recall the officers asking permission to enter and search the apartment, although it is possible that she was asked. (Tr. 133, 138.) She later testified that she was "positive" she did not give the officers permission to search. (Tr. 134, 138, 148.) But she did not object when the officers entered. (Tr. 138.) The officers went down the hallway in the apartment and she could hear them talking but could not hear what they were saying. (Tr. 130-31.) She could also hear people moving around downstairs in the common basement of the apartment building that is not accessible from inside her apartment. (Tr. 131.)

She was later questioned about the rifles found in the bedroom closet and Rose stated that they were not hers. (Tr. 132, 139.) She described her demeanor as "shocked yet calm." (Tr. 132.) Although admitting that the time of this incident was a particularly difficult time in her relationship with the defendant, and that the relationship was "on again/off again," Rose denied that she was not

"on good terms" with her husband during this time. (Tr. 139-40.) Since this incident, there was an incident where Rose was going to leave the defendant over the defendant's objections. (Tr. 142.) A confrontation ensued where Rose's brother was stabbed by the defendant. (Tr. 142.) The criminal charges brought as a result of that incident were subsequently dismissed. (Tr. 142.) There was also another assaultive incident in March of 2006 while the defendant was on bond during the pendency of this case that resulted in Rose obtaining a temporary restraining order against the defendant, which was eventually dismissed when Rose failed to appear in court. (Tr. 144-45.)

**ANALYSIS**

The defendant seeks suppression of the physical evidence, i.e. the two long guns recovered on January 13, 2003, and his response to the detective's question of whether there were any guns in the residence on January 14, 2003, pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (Docket No. 97 at 9.) The court shall address each of these issues separately.

**Physical Evidence**

It is the government's contention that the detectives were entitled to enter the residence on January 13, 2003 to attempt to arrest the defendant under the rule set forth by the Supreme Court in Payton v. New York, 445 U.S. 573 (1980), wherein the Court stated, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 603. There are two prongs to the Payton rule. First, the law enforcement officers must believe that the home that they seek to enter is the residence of the person for whom they have an arrest warrant. Second, the law enforcement officers must believe that the person they seek to arrest is within the residence at that time.

As this court noted in a prior recommendation, United States v. Vallejo, 05-CR-204, July 11, 2007, Docket No 912, at 104-06, (adopted by the district judge without defendant objection, November 7, 2007, Docket No. 1006),

[t]he degree of certainty the officers must possess regarding whether the home was [the defendant's] residence is unresolved in this circuit. Nearly all circuits that have addressed this question have held that law enforcement officers are authorized to enter a residence when they have "reason to believe" that the target residence is that of the suspect for whom they have a warrant. See Valdez v. McPheters, 172 F.3d 1220, 1224-25 (10th Cir. 1999) (citing United States v. Route, 104 F.3d 59, 62 (5th Cir.) ("A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is 'reason to believe' that the suspect is within"); United States v. Risse, 83 F.3d 212, 216 (8th Cir.1996) ("officers executing an arrest warrant must have a 'reasonable belief that the suspect resides at the place to be entered … and [have] reason to believe that the suspect is present' at the time the warrant is executed"); United States v. Lauter, 57 F.3d 212, 215 (2nd Cir.1995) ("the proper inquiry is whether there is a reasonable belief that the suspect resides at the place to be entered … and whether the officers have reason to believe that the suspect is present"); United States v. Edmonds, 52 F.3d 1236, 1248 (3d Cir.1995) (although "the information available to the agents clearly did not exclude the possibility that [the suspect] was not in the apartment, the agents had reasonable grounds for concluding that he was there"), vacated in part on other grounds, 52 F.3d 1236, 1251 (3d Cir.1995); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir.) ("the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry")).

This "reasonable belief" standard has been adopted in at least four district court decisions within this circuit. Covington v. United States DOJ, 2007 U.S. Dist. LEXIS 16872, 13-15 (C.D. Ill. 2007); Todosijevic v. County of Porter, 2005 U.S. Dist. LEXIS 36753, 13-15 (N.D. Ind. 2005); Blake v. Peterson, 1995 U.S. Dist. LEXIS 8222, 9 (N.D. Ill. 1995); Harasim v. Kuchar, 702 F. Supp. 178, 180-81 (N.D. Ill. 1988).

The Ninth Circuit, however, has held that an entry into a home is not authorized unless law enforcement officers have probable cause to believe that the home is the residence of the person for whom law enforcement has a warrant to arrest. United States v. Harper, 928 F.2d 894, 896 (9th Cir. 1991). However, as discussed in Todosijevic, 2005 U.S. Dist. LEXIS 36753 at 15, and Valdez, 172 F.3d at 1225 n.1, it is unclear whether Harper's probable cause standard remains good law in the Ninth Circuit.

The court finds persuasive the reasoning set forth in Covington wherein the court adopted the reasonable belief standard stating, "In addition to it being the majority rule, the Seventh Circuit and the Supreme Court have both held that 'the touchstone of Fourth Amendment search inquiry is reasonableness.' Green v. Butler, 420 F.3d 689, 694 (7th Cir. 2005); Samson v. California, 126 S. Ct. 2193 (2006). There is nothing in the Fourth Amendment or Seventh Circuit rulings on the subject which would lead this Court to conclude that a 'probable cause' standard is appropriate in this case." Covington, 2007 U.S. Dist. LEXIS 16872, 15-16.

Ford testified that he identified the Thurston Avenue address as being the defendant's by "using the information from jail records." (Tr. 8.) Ford also learned "[t]hrough investigation" that

the defendant's wife also resided at this residence. (Tr. 8.) The court received no evidence as to the source of this investigative information or its age. Without this foundational evidence, the hearing record may contain some doubt about whether it would be reasonable for a law enforcement officer to believe that the Thurston Avenue residence was the defendant's residence. On the other hand, even if the information was months old, the jail information was self-reported by the defendant when he was being booked on a prior charge. The officers should be able to rely on this information unless something contrary came to their attention. Furthermore, when the officers first made contact with Rose, she stated that the defendant was not there, and let them enter to look for themselves. Only later did she say that he "used to live there." Had she said this at the outset, it may have created a reasonable doubt about the defendant's residency at the Thurston address.

However, the court need not decide whether the detectives possessed sufficient information to believe that the Thurston Avenue residence was the defendant's residence, because the court finds that the government completely fails to make any showing with respect to the second prong, i.e., the defendant's presence at the time. Ford and the other detectives possessed no information that would support the conclusion that the defendant was in the Thurston Avenue residence at the time they entered on January 13, 2003. The detectives did not, for example, see the defendant enter the residence, contact him on the telephone, or receive information from another person that he was in the residence. Further, when Ford asked Rose if the defendant was inside the residence, Rose responded that he was not. (Tr. 12.) Because the detectives lacked any solid information that the defendant was within the residence, or had any reason to believe he was there, at the time they entered, the detectives were not authorized to enter the residence to search for the defendant pursuant to the Payton rule.

Therefore, the detectives were authorized to enter the residence only if Rose consented. Consent to a search is determined by the totality of the circumstances. Schneckloth v. Bustamonte,

412 U.S. 218, 227 (1973). "Relevant factors include (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent." United States v. Raibley, 243 F.3d 1069, 1075-76 (7th Cir. 2001) (citing United States v. Strache, 202 F.3d 980, 985 (7th Cir. 2000); Valance v. Wisel, 110 F.3d 1269, 1278 (7th Cir. 1997)). The government must prove, by a preponderance of the evidence, that the consent was freely given. Id. at 1076. The dispute in the present case is not whether the consent was voluntarily given but rather, whether consent was given at all. (See Docket No. 97 at 14.)

Rose's testimony regarding whether or not she gave consent is contradictory. At times she stated that she did not recall being asked for consent to allow the detectives to search the residence but that it was possible that she was asked. (Tr. 138.) At other points, she testified that she was "positive" that she never gave the detectives consent to search. (Tr. 134, 138, 148.)

However, the testimony of the detectives was unequivocal. Ford repeatedly testified that he asked Rose if they could come in and look for the defendant. (Tr. 12, 41.) Chang's testimony was consistent with Ford's; Ford asked Rose if they could come in and look for the defendant and, although Chang cannot recall Rose' exact words, knows she responded in the affirmative. (Tr. 72-73.)

The court finds that the government has met its burden in demonstrating that Rose consented to allowing the detectives enter the residence to search for the defendant. Rose's memory of her interaction with the detectives is understandably foggy. This incident occurred more than five years ago and unlike the detectives, Rose did not have the benefit of reports written at the time of the incident to refresh her recollection. However, even if she was testifying immediately following

this incident, the evidence suggests that Rose would not have been in the best position to recall the precise details of the incident. Rose had been awoken to find numerous detectives at her door peppering her with questions about her estranged husband. The contact was relatively brief. The court finds it most likely that Rose simply does not recall that amongst his numerous questions Ford asked her if they could enter to search for the defendant and that she agreed. Unlike Rose, the detectives, Ford especially, would have particular reason to pay attention to and not whether or not Rose was asked if they could enter the residence and her response. Therefore, based upon the totality of the circumstances, the court finds that the government has met its burden in demonstrating that Rose consented to allowing the detectives into the residence to search for the defendant.

The defendant does not argue that the detectives exceeded the scope of Rose's consent or that the detectives otherwise improperly seized the firearms, and therefore the determination that Rose consented to the detectives searching the residence for the defendant concludes the court's inquiry into this aspect of the defendant's motion to suppress.

**Statements**

The facts that form the basis for the defendant's motion to suppress are essentially undisputed. The detectives forced their way into the defendant's residence seeking to arrest him. The defendant identified himself, stated he was unarmed, and came out from a back bedroom, wearing only his underwear, to be taken into custody. Immediately after being handcuffed, Ford asked the defendant if there were any firearms in the residence. The defendant responded by indicating towards the bedroom where the day before the detectives had removed the two firearms. The defendant does not challenge any of his subsequent post-arrest statements and therefore the court shall not address these statements.

> In order to protect an individual's right against self-incrimination under the Fifth Amendment, the Supreme Court held in <u>Miranda v. Arizona</u>, 384 U.S. 436, 444

-13-
Case 2:05-cr-00145-LA   Filed 06/23/08   Page 13 of 17   Document 101

(1966), that suspects must be advised of certain rights before they are subjected to "custodial interrogation." A suspect must be both in custody and subject to "interrogation" to trigger the Miranda warnings requirement.

United States v. Yusuff, 96 F.3d 982, 987 (7th Cir. 1996) (citation omitted).

The government concedes that the defendant was in custody at the time he was asked the relevant question and therefore the court's analysis initially focuses upon whether or not Ford's question constitutes interrogation.

The Court in Miranda defined interrogation as "questioning initiated by law enforcement officers." Miranda, 384 U.S. at 444. The Court later expanded on this definition and said "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980); see also Pennsylvania. v. Muniz, 496 U.S. 582, 601 (1990) (quoting Harryman v. Estelle, 616 F.2d 870, 874 (5th Cir. 1980)) (defining interrogation as including "both express questioning, and also words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused.'").

Applying the Innis and Muniz definitions to the facts of this case, this court finds that under the attendant circumstances, Ford's question constituted interrogation in that it was a question that was likely to elicit an incriminating response from the defendant. This is because Ford knew that firearms had been found in the defendant's bedroom, that the defendant was a felon, and the defendant's response, if in the affirmative, would be incriminating. Therefore, Ford's question was permissible only if it fell within a narrow exception to the Miranda rule, commonly referred to as the public safety exception, which was first recognized in the factually analogous case of New York v. Quarles, 467 U.S. 649 (1984).

In Quarles, two patrol officers were notified by a victim that she had just been raped by an armed man. Id. at 651-52. Upon identifying a suspect fitting the rapist's description in a grocery store, the suspect fled, and the officers gave chase. Id. at 652. An officer apprehended the suspect, handcuffed him, and upon frisking him discovered an empty handgun holster. Id. at 652. The arresting officer asked the suspect where the gun was and in response, the suspect "nodded in the direction of some empty cartons and responded, 'the gun is over there.'" Id. at 652.

The Court held that under the facts presented, "the need for answers to questions posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657. However, the Court failed to set down clear guidelines for when this public safety exception should apply other than to note that it should apply when there is an "objectively reasonable need to protect the police or the public from an immediate danger associated with the weapon." Id. at 659 n.8. Rather, the Court simply stated that it believed that police officers could recognize when the exception should apply "almost instinctively." Id. at 658.

Although the defendant was handcuffed and apparently unarmed at the time Ford asked him whether there were firearms in the residence, the court finds that based upon the evidence adduced at the evidentiary hearing, there existed a reasonably threat to the arresting detectives and to the other residents of the apartment that permitted Ford to ask about other firearms in the residence without advising the defendant of his Miranda rights.

First, a potential threat existed to the safety of the arresting detectives. At the time of Ford's question, the detectives had not yet secured the rest of the residence and determined whether there was anyone else in the apartment who might pose a threat to the officers. Although the defendant argues that it was unnecessary for the detectives to conduct a protective sweep of the residence because the detectives had maintained surveillance on the apartment and there was no evidence that

anyone else had entered the apartment, the court finds this argument unpersuasive. As pointed out by the government, it is unclear whether the detectives' surveillance on the residence was continuous. Additionally, and more importantly, it does not appear that the detectives were able to observe only the apartment building's common entry door and not the entry door into the defendant's individual unit. Based upon the evidence presented at the evidentiary hearing, it appears that the detective's surveillance consisted largely of identifying the persons who came and went from the apartment building. Thus, if an unidentified person entered through the common entry to the apartment building, the detectives would not know whether this unidentified person went to the defendant's unit or any of the building's other units. Therefore, even if the building was kept under constant surveillance, the detectives would not be able to be sure, certainly not sure enough to literally stake their lives on it, that the defendant was alone in the apartment.

Second, based upon the detectives' conversation with Rose the day before, the defendant was secreting firearms in the residence without her knowledge. Rose lived in the apartment with two children, one of whom was an infant and another who was a toddler. The detectives recovered 9mm ammunition, but not a 9mm firearm and thus suspected that another firearm remained secreted in the residence. The firearms discovered by the detectives the day before were found loaded, and therefore the detective could be reasonably concerned that a loaded 9mm firearm was hidden in the residence, which might be discovered by one of the children. A firearm secreted in a residence without the knowledge of the resident who lives there with her two small children poses a risk to the safety of all three individuals.

The defendant argues that the detectives should have secured the residence and then obtained a search warrant to alleviate this potential threat to the safety of the apartment's residents. The court finds such delay unwarranted. In balancing the competing interests, the safety of the apartment's residents versus the defendant's rights under the prophylactic rule set forth in <u>Miranda</u>,

see Quarles, 467 U.S. at 657, the court finds that the defendant's interests should yield to those of the apartment's other residents. A search constitutes a far more invasive and explicit intrusion into the constitutionally protected interests of all the apartment's residents than a detective asking a single, isolated, non-coercive question in the interest of protecting the safety of the apartment's residents. Therefore, it is the conclusion of this court that Ford's question fell within the public safety exception to Miranda recognized in Quarles, and thus the defendant's motion to suppress statements should be denied.

**IT IS THEREFORE RECOMMENDED** that the defendant's motions to suppress be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 23rd day of June 2008.

s/AARON E. GOODSTEIN<br>U.S. Magistrate Judge