# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                        Case No. 05-CR-145

RASHID ABDULLAH SALAHUDDIN,

        Defendant.

_____

# ORDER

The criminal case comes before the court with a long and deeply troubled procedural history that includes more than 100 docket entries, a withdrawn guilty plea, a jury trial, a Seventh Circuit remand to consider unresolved pretrial motions, and reassignment to three different district court judges. The court will articulate the full procedural background below; however, details most pertinent to the motions currently before the court are as follows:

On June 7, 2005, a grand jury indicted defendant Rashid Abdullah Salahuddin ("Salahuddin") on a single count of being a felon in possession of two firearms. Eight months after the deadline passed for the submission of pretrial motions, Salahuddin filed motions to suppress evidence and statements. Over the government's objection, the assigned magistrate judge found that the defendant had met the good cause requirement and agreed to hear the motions. The government took exception to the magistrate's ruling and appealed. On appeal, the district court summarily denied the untimely motions for failure to meet the "good cause"

requirement for filing beyond the deadline. On August 15, 2006, a jury convicted Salahuddin while his motions to suppress remained unaddressed. Salahuddin appealed. Finding that the district court committed clear error in refusing to consider the defendant's motions to suppress, the Seventh Circuit Court of Appeals vacated the judgment and remanded with instructions that the motions be addressed on their merits. *United States v. Salahuddin,* 509 F.3d 858 (7th Cir. 2007). On June 23, 2008, Magistrate Judge Aaron E. Goodstein issued a report to Judge Rudolph T. Randa, the assigned district judge, recommending that the motions be denied. In response, counsel for Salahuddin filed objections to the magistrate's report. After receiving the magistrate's report and recommendation, Judge Randa recused himself from any further role in the case. The case was then randomly assigned to this branch of the court. After *de novo* review, the court will adopt Magistrate Goodstein's recommendation in part, and deny the defendant's motion to suppress physical evidence.[1] However, based upon the court's *de novo* review of the record and the submissions of counsel, the court is obliged to grant the defendant's motion

---

[1]The court was prepared to issue its decision on *de novo* review of the magistrate's recommendations on October 10, 2008. As part of its review, the court took note of the troubling procedural history of this case and the ever-mounting commitment of limited prosecution, defense, and judicial resources that, when taken together, have become prohibitively expensive and certainly less than cost effective to taxpayer interests. Thus, the confluence of these factors together with the interests of justice more than suggest that the court and counsel for the parties make a good faith effort toward resolution of this case without the necessity of further litigation. Toward that end, on October 9, 2008, the court met in chambers with the Federal Defender, Daniel Stiller, and the United States Attorney, Steven Biskupic, to explain that the court had completed its review of the magistrate's recommendation and, without further elaboration, indicated that neither side would be happy with the court's ruling since litigation in the case would likely continue unabated. The court then provided counsel with additional relevant background facts leading to the court's recommendation that the parties explore potential alternatives to the current charge. The court concluded by stating that it would withhold release of today's ruling for a reasonable period so as to provide the parties with a safe harbor within which to consider an alternative disposition.

Case 2:05-cr-00145-LA    Filed 01/08/09    Page 2 of 31    Document 107

to suppress statements he made at the time of his arrest prior to receiving *Miranda* warnings. The court is also obliged to grant Salahuddin a new trial because the jury heard his inadmissible statements, which served to prejudice him in the eyes of the jury.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B), a magistrate judge may consider dispositive motions, such as motions to suppress, and issue recommendations to the district judge regarding the motions. *See id.* When a party objects to a magistrate's findings, the district court judge must make *de novo* determinations as to these findings. *See id.* § 636(b)(1)(C); *see also Delgado v. Bowen,* 782 F.2d 79 (7th Cir. 1986). The district court may adopt the recommendation in part or in its entirety and has the final authority of judgment in the case. *Delgado*, 782 F.2d at 82. If necessary, the district court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." § 636(b)(1). The court has reviewed the evidence and transcripts from the evidentiary hearing and finds them sufficient to make factual and credibility determinations on those records alone.

## BACKGROUND

### I.    Procedural Background

On June 7, 2005, a grand jury sitting in the Eastern District of Wisconsin returned a one-count indictment charging Salahuddin with being a felon in possession of firearms in violation of federal law. Specifically, the indictment

Case 2:05-cr-00145-LA    Filed 01/08/09    Page 3 of 31    Document 107

alleged that on or about January 13, 2003, Salahuddin, having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, possessed two firearms: a Marlin, model 60, .22 caliber rifle, and a Remington, model 870, 20 gauge shotgun, in violation of 18 U.S.C. § 922(g)(1).

In August 2005, shortly before the case was scheduled to proceed to jury trial before Judge Charles N. Clevert, Jr., Assistant United States Attorney ("AUSA") Gordon Giampietro presented Salahuddin and his retained counsel, Robert D'Arruda, with a proposed plea agreement. Under the terms of the agreement, the maximum statutory term of imprisonment for the offense to which Salahuddin would plead guilty was a term of 10 years. However, the proposed plea agreement also included boilerplate language in which Salahuddin acknowledged that he may be subject to Armed Career Criminal (ACC) treatment under 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. ACC treatment would subject Salahuddin to an enhanced 15-year mandatory minimum term of imprisonment, instead of the 10-year maximum term provided for the offense alone. The terms of the plea agreement also provided that Salahuddin could not move to withdraw his guilty plea solely as the result of a determination that he was an armed career criminal. In an apparent attempt to assuage any concern by Salahuddin and/or his counsel as to whether Salahuddin did or did not qualify for the ACC enhanced sentence, Giampietro accompanied the proposed plea agreement with a 3-page letter that painstakingly detailed Salahuddin's criminal history and projected sentencing guideline computations. Based upon this information, Giampietro's letter concluded that Salahuddin did not

-4-

qualify for ACC treatment. On September 2, 2005, Salahuddin appeared for his initial change of plea hearing. At some point that day,[2] AUSA Giampietro again represented to Salahuddin that he did not believe that Salahuddin qualified as an armed career criminal. This verbal assurance came during a face-to-face conversation in the hallway outside the courtroom where Salahuddin's change of plea hearing occurred. During the plea hearing, Salahuddin exhibited concern regarding his possible treatment as an armed career criminal and his waiver of the right to challenge the government's evidence. Salahuddin ultimately decided not to enter a "guilty" plea. However, Salahuddin later changed his mind and elected to go forward with a guilty plea.

Five days later, on September 7, 2005, Salahuddin appeared for a second change of plea hearing and entered a "guilty" plea, which was accepted by the court. The hearing included little discussion of Salahuddin's prior criminal history, and no discussion of his potential for armed career criminal treatment. The only specific references to Salahuddin's criminal history were the judge's questions to the defendant about the type of offense he was previously convicted of in 1987, the sentence he received, and the institutions where he served his sentence. Notably, during the plea colloquy Judge Clevert asked Salahuddin why he purchased the two weapons. Salahuddin responded that he purchased the guns to go hunting with a friend, which he did once, but that he did not fire either weapon. Salahuddin further

---

[2]Salahuddin asserts that the conversation occurred immediately after the change of plea hearing in which Salahuddin decided not to enter a "guilty" plea. The government claims that the conversation occurred prior to the hearing. However, this distinction is unimportant for this court's purposes.

Case 2:05-cr-00145-LA    Filed 01/08/09    Page 5 of 31    Document 107

testified that other than some initial target practice following his purchase, the weapons had never been fired or used for any other purpose during the many years that followed.

The court next scheduled the case for sentencing on December 9, 2005. In preparation for this hearing, the Probation Department prepared a presentence report concluding that Salahuddin did not qualify for ACC offender status. The court gave the parties until November 24, 2005, to file objections to the report; however, none were forthcoming. Two days prior to the hearing, AUSA Giampietro passed the case file to a second AUSA, Lisa Wesley, who had agreed to cover the sentencing on Giampietro's behalf. In preparation for the sentencing hearing, AUSA Wesley reviewed the presentence report and concluded that Salahuddin should have been treated as an ACC offender based on his previous armed robbery conviction. The conviction involved three different victims at three separate locations. After learning this information, AUSA Giampietro contacted the probation office and defense counsel regarding the "discovery." On December 8, 2005, the day prior to the scheduled sentencing hearing, counsel for the parties requested an adjournment to allow further investigation into whether Salahuddin qualified as an armed career criminal for purposes of sentencing. Despite the fact that the deadline for objections to the presentence report had passed, Giampietro's contact prompted the assigned probation officer to prepare and submit an addendum to the report, which concluded that Salahuddin was indeed subject to ACC offender status.

Case 2:05-cr-00145-LA    Filed 01/08/09    Page 6 of 31    Document 107

In the meantime, the court rescheduled the sentencing hearing for January 5, 2006. That morning, defense counsel filed a motion seeking further adjournment of the sentencing hearing. As grounds for adjournment, defense counsel cited the following: a) the government's post-deadline objection to the presentence report; b) the need for more time to explore possible substantial assistance Salahuddin might provide to receive a sentence below the 15-year statutory minimum; c) Salahuddin's desire to withdraw his guilty plea based upon his newly-determined armed career criminal status; and d) counsel's request to withdraw. The court addressed the motion that afternoon during the scheduled sentencing hearing. Defense counsel argued that the court should grant leave for him to withdraw based on the possibility that he would be called to testify if Salahuddin pursued his withdrawal of plea, as well as Salahuddin's failure to make payments stipulated under their retainer agreement. The court granted counsel's request to withdraw. The court also referred the case to the federal defender for purposes of securing new counsel. Salahuddin's sentencing was further postponed until January 25, 2006.

On January 23, 2006, two days prior to the hearing, Salahuddin filed a motion to withdraw his guilty plea upon the advice of new counsel. Salahuddin based his motion on the following: a) his belief that he would be sentenced to a term of 46-57 months, with a maximum exposure of 10-years imprisonment, if he plead guilty; b) his retained counsel's inexperience with federal law; c) Salahuddin's concern regarding the greatly enhanced sentence evidenced in his first change of plea hearing; d) AUSA Giampietro's written and verbal assurance that Salahuddin need

not be concerned about the ACC enhancement; e) lack of discussion about ACC treatment at his September 7, 2005, change of plea hearing; and f) the government's eve-of-sentencing determination that Salahuddin qualified as an armed career criminal. Pursuant to a joint request by the parties, the sentencing hearing was, once again, adjourned to February 1, 2006.

At the February 1, 2006 hearing, the court deferred determination on Salahuddin's motion to withdraw his guilty plea to allow the parties to research relevant case law regarding whether Salahuddin qualified as an armed career criminal based on the current record before the court. The court prohibited the government from supplementing the record, and instead required the government to make its showing based on the documents already in the record.

On February 28, 2006, the court conducted a hearing to address both the sufficiency of the record to establish ACC treatment, as well as Salahuddin's motion to withdraw his guilty plea. The government did not file its brief until the afternoon before the hearing. As a result, the court adjourned the morning hearing until later in the day to allow time for review of the parties' submissions. When the hearing reconvened, the court granted Salahuddin's motion to withdraw his plea and recused itself from further participation in the case. The written order that followed explained that the court based its grant of Salahuddin's motion on "all the records and proceedings...particularly the facts and circumstances surrounding the defendant's plea," but provided no further explanation or insight into the court's decision-making process. Finally, citing to 28 U.S.C. § 455(a), Judge Clevert

-8-

recused himself and the file returned to the clerk of court where it was randomly reassigned to Judge Rudolph T. Randa.

On March 27, 2006, Salahuddin filed motions to suppress evidence and statements and requested an evidentiary hearing. Salahuddin filed the motions eight months beyond the July 7, 2005 deadline originally established for filing such motions. Given the uncertainty surrounding Salahuddin's status as an armed career criminal and despite the untimely filing, the magistrate judge ruled that the motions should be considered and an evidentiary hearing scheduled[3]. The magistrate judge's ruling brought an appeal to the district court from the government. On appeal, the district court reversed the magistrate's ruling, canceled the evidentiary hearing, and terminated the suppression motions. As grounds for the summary reversal, the court cited the late filing of the motions and found that they did not meet the statutory "good cause" requirement for filing beyond the established deadline.

Salahuddin proceeded to a jury trial on August 14 and 15, 2006. At the trial, officers from the Milwaukee County Sheriff's Department testified regarding their recovery of physical evidence consisting of two long guns from Salahuddin's alleged residence on January 13, 2003. The officers also testified to Salahuddin's statements about the presence of weapons in the apartment, which he made prior to receiving *Miranda* warnings. Among other evidence, the government entered as exhibits A.T.F. Forms F-4473, Firearms Transaction Record. These records were

---

[3]It should be noted parenthetically that the defendant had earlier waived his right to a speedy trial and the district judge had adjusted the scheduled trial date from May to August to accommodate the late-filed motions.

Case 2:05-cr-00145-LA   Filed 01/08/09   Page 9 of 31   Document 107

generated in June 1996, at the time Salahuddin had actually purchased the firearms in question from two Milwaukee-area Kmart stores. Agents recovered a latent impression from one form that matched Salahuddin's left palm print. At conclusion of the two-day trial, the jury found Salahuddin guilty.

Three months later, the court sentenced Salahuddin to the statutory mandatory minimum 15 years of imprisonment, followed by a 3 year term of supervised release. Salahuddin appealed his conviction and sentence. On December 19, 2007, a year after imposition of Salahuddin's sentence, the Seventh Circuit Court of Appeals found that the district court committed clear error in refusing to consider Salahuddin's untimely motions to suppress evidence. The court vacated the district court's judgment and remanded the case to allow Salahuddin to litigate his suppression motions. Following remand, an evidentiary hearing was conducted before Magistrate Judge Aaron E. Goodstein on April 30, 2008. On June 23, 2008, the magistrate judge issued his report and recommendation concluding that Salahuddin's motions to suppress should be denied. Salahuddin filed objections to the recommendation. Before reaching the merits of Salahuddin's objections, Judge Randa recused himself, citing to Seventh Circuit Rule 36. Once again, the case was randomly reassigned. The motions to suppress physical evidence and statements are now before this branch of the court for *de novo* review.

## II. Factual Background and Testimony

On April 30, 2008, Magistrate Judge Goodstein conducted an evidentiary hearing on Salahuddin's motions to suppress. The court heard testimony from Rose

Salahuddin, the defendant's wife, as well as from Milwaukee County Sheriff's Department Officers James Ford, Luke Chang, and Scott Stiff. The following represents a summary of the witnesses' testimony.

### A. Deputy James Ford

Milwaukee County Deputy Sheriff James Ford ("Deputy Ford") testified that on January 13, 2003, he was the lead officer on a warrant squad affecting an arrest on Willie Gray, also known as Rashid Abdullah Salahuddin. (Tr. 5-6, 10). At approximately 4:30 p.m., the team of Milwaukee County Sheriff Department officers approached a Thurston Avenue multi-unit apartment building seeking the defendant. (Tr. 9). The officers targeted the location because Milwaukee County Jail records listed the apartment as Salahuddin's last known address. (Tr. 8). Deputy Ford, Sergeant Scott Stiff, and Detectives Greg Zimmer and Luke Chang approached the building and rang the doorbell, but received no answer. (Tr. 9-10). The officers then called the apartment, identified themselves to the woman on the phone, and explained that they were seeking the defendant. (Tr. 10). The woman who answered, Rose, came to the door and spoke cordially with the uniformed officers. (Tr. 10, 12). She informed the officers that Salahuddin was not in the apartment, and consented to Deputy Ford's request for entry to look around. (Tr. 12). The officers did not ask her to sign a written consent nor did they inform Rose of her right to refuse entry. (Tr. 41, 44-45). The officers then fully searched the apartment, which contained only Rose and young children. (Tr. 13). During the search, the officers uncovered ammunition and two long guns, a 20 gauge shotgun and a .22

-11-

caliber rife, in a bedroom closet. (Tr. 13-14). Though the officers found 9mm ammunition, they did not find a 9mm firearm. (Tr. 16, 49)**.** Mail and paperwork in the defendant's name, as well as men's clothing, were also found near the weapons. (Tr. 16). When asked about the firearms, Rose responded that they did not belong to her, but instead belonged to the defendant. (Tr. 14). Rose also stated that she and Salahuddin were separated and that he did not currently reside in the apartment. (Tr. 14-15). The officers again asked Rose's permission to search the apartment for additional weapons, but she refused. (Tr. 16-17). The officers then left, taking the weapons and bag of ammunition. (Tr. 17, 65-66).

Other officers remained at the location to conduct surveillance on the residence overnight, believing that Salahuddin still resided there. (Tr. 17-18). Early the next morning, Rose and her children were observed leaving the apartment. (Tr. 19-20). At around 10:00 or 10:30 a.m., a man that the officers identified as Salahuddin was observed entering the building with a key. (Tr. 18, 20). The officers approached the apartment building and breached the outer door. (Tr. 21). The officers then knocked on the apartment door, and when they received no response, forced entry. (Tr. 21-23). Upon entering the apartment, the officers identified themselves and the defendant responded that he was unarmed. (Tr. 23). Salahuddin complied with instructions and was handcuffed while wearing only his underwear. (Tr. 23-25). After handcuffing Salahuddin, but prior to providing *Miranda* warnings, Deputy Ford asked Salahuddin whether there were any weapons in the apartment. (Tr. 24, 47-48). The defendant replied that there were two guns in the

closet and indicated towards the bedroom where the firearms were uncovered the previous day. (Tr. 24). The officers allowed Salahuddin to dress before taking him to the Criminal Investigation Bureau where he was *Mirandized* and then questioned. (Tr. 25-26). In response to questioning, Salahuddin stated that he used to live at the apartment, but that the guns belonged to Rose. (Tr. 30-31). The defendant further stated that he was not a felon in possession of a firearm and he did not want to answer any more questions. (Tr. 30). At that point, Deputy Ford terminated the interview. (Tr. 32).

### B. Detective Luke Chang

Milwaukee County Sheriff Detective Luke Chang ("Detective Chang") accompanied a team to the Thurston Avenue apartment in search of Salahuddin on January 13, 2003. (Tr. 67-68). He testified that the uniformed and armed officers made contact with Rose at the door and the parties calmly discussed the reason for the officers' presence at the apartment. (Tr. 68, 70, 71-72). Deputy Ford asked Rose's permission to enter the apartment, which she supplied. (Tr. 72). Detective Chang and the other officers then searched the residence for Salahuddin. (Tr. 72-73). While searching a bedroom closet, Detective Chang discovered two loaded long guns in cases and a bag of ammunition. (Tr. 73-74). Rose was asked who the weapons belonged to and she answered that they belonged to Salahuddin. (Tr. 75). Detective Chang ended his search after recovering the weapons. He took custody of the items, inventoried them, and placed them into evidence. (Tr. 76-77).

Detective Chang watched the apartment throughout the night as part of a surveillance team. (Tr. 78). When notified by another team member that Salahuddin had entered the apartment with a key, Detective Chang and the other officers assembled to enter the residence. (Tr. 78). The officers forced entry and identified themselves as police. (Tr. 79). Salahuddin called out his location from the back bedroom, came out wearing only his underwear, and another officer placed him into custody. (Tr. 80-81, 83). At some point, Salahuddin was asked about the presence of firearms in the apartment. (Tr. 81). In response, he motioned with his head towards the bedroom where Detective Chang uncovered the guns the day before. (Tr. 81). Detective Chang did not participate in transporting or questioning the defendant. (Tr. 85-86).

### C.    Sergeant Scott Stiff

Milwaukee County Sheriff Sergeant Scott Stiff ("Sergeant Stiff") testified that he served as part of a perimeter containment team searching for Salahuddin on January 13, 2003. Sergeant Stiff set up the perimeter while Deputy Ford and Detective Chang contacted the residents of the apartment. (Tr. 108). Sergeant Stiff did not enter the apartment until after the search, but did observe two firearms in the bedroom closet. (Tr. 109). Sergeant Stiff participated in the surveillance of the apartment building on the morning of January 14, 2003. (Tr. 111). Sometime after 7:00 a.m., Rose exited the apartment with her children. (Tr. 111). Sergeant Stiff then observed Salahuddin enter the residence with a key and he notified the other officers. (Tr. 112). Following forced entry into the apartment and identification by

-14-

the officers, the defendant called out his location and stated that he was not armed. (Tr. 112-113). Sergeant Stiff observed Salahuddin exit the bedroom, comply with orders, and be placed into custody. (Tr. 113). When asked whether there were any weapons in the residence, Salahuddin stated that there were two rifles in the bedroom and indicated towards the bedroom with his head. (Tr. 113). Sergeant Stiff was also present as a witness during the questioning of Salahuddin a few hours later. (Tr. 114). Deputy Ford read Salahuddin his rights from a printed form and the defendant signed the form. (Tr. 116). When asked about the guns found in the closet, Salahuddin answered that they belonged to Rose. (Tr. 118). He also described one of the weapons as a 16 gauge. (Tr. 118). The defendant denied being a felon in possession of firearms and refused further questioning. (Tr. 118). Sergeant Stiff also testified that the officers did not have search warrants for the residence on either January 13, 2003, or January 14, 2003. (Tr. 119-120).

**D. Rose Salahuddin**

Rose Salahuddin ("Rose") testified that she is married to the defendant and they have two children, ages three and four months at the time of the incident. (Tr. 125, 127). She described her demeanor during the events of January 13, 2003 as "shocked yet calm." (Tr. 132). On that day, Rose was sleeping when she received a phone call from police asking her if anyone was home and asking her to come to the door. (Tr. 126-127). She and her children answered the door, where an officer stated that they were looking for Salahuddin. (Tr. 128). Rose was initially confused by the interaction, describing herself as "coming out of a daze." (Tr. 128). Rose

-15-

responded that there was no one else in the apartment. (Tr. 128, 131). Rose testified that she backed up from the door and the officers entered and walked past her with their weapons drawn. (Tr. 129). Rose further testified that she was "positive" she did not give officers permission to search the apartment. (Tr. 134). However, she also stated that she did not recall the officers asking permission to enter, but that it was possible she had been asked. (Tr. 138). Rose did not object to the entry of the officers, nor did she tell the officers that she did not want them in the apartment. (Tr. 138). The officers searched the apartment and then questioned her about rifles they found in the bedroom. (Tr. 132). Rose responded that the firearms were not hers. (Tr. 132).

## ANALYSIS

Salahuddin argues for the suppression of both physical evidence and statements. First, Salahuddin urges this court to suppress physical evidence consisting of two guns recovered at his residence on January 13, 2003. He argues that the police obtained this evidence through a warrantless search of the apartment. Second, Salahuddin urges the court to suppress his January 14, 2003 statements in response to Deputy Ford's question about whether there were any guns in the residence. Salahuddin argues that he made the incriminating response while in custody, but prior to receiving *Miranda* warnings. Therefore, he asserts that the statements are inadmissible evidence. The court will address each motion in turn.

-16-

## I.    Physical Evidence

Salahuddin argues that the court should suppress the physical evidence of the guns because the officers did not have consent to search the apartment. Salahuddin points to Rose's testimony that she is "positive" that she was not asked and did not consent to a search of the residence, as well as her general credibility as a witness.  In response, the government asserts that Salahuddin did not object to the magistrate judge's recommendation that his motion to suppress physical evidence be denied.  The government argues that, as a result, Salahuddin waived the right to pursue a physical evidence argument.  The court agrees that Salahuddin waived his argument regarding the physical evidence because he failed to object to the magistrate's recommendation regarding this evidence.

Failure to object to the recommendations and decision of a magistrate judge results in a waiver of appellate review under USCA § 636(b)(1)(B, C). *United States v. Hall*, 462 F.3d 684, 688 (7th Cir. 2006).  The purpose of the waiver rule is to promote efficiency so that district courts can address errors without conducting plenary reviews of magistrate judges' proceedings. *Id.*  The Seventh Circuit has a general rule stating that a party who fails to file an objection to the magistrate judge's recommendation waives the right to appeal the factual and legal issues involved. *United States v. Hernandez-Rivas*, 348 F.3d 595, 598 (7th Cir. 2003) (citing *United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996)).  Despite the general waiver rule, the court applies an exception when waiver would "defeat the ends of justice." *Id.*  However, the exception does not apply every time an attorney fails to file an

objection to a magistrate's recommendation. *See Id.* at 598-99. This would render the general rule superfluous. *See Id.* Finally, if a party only objects to parts of the magistrate's recommendation, the party waives review of the issues to which he did not object. *Willis v. Caterpillar Inc.*, 199 F.3d 902, 904-05 (7th Cir. 1999) (citing *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999)).

Salahuddin waives his physical evidence argument because he failed to make a specific objection to the magistrate's recommendation. In his report and recommendations, the magistrate judge found that Rose gave consent for the search that uncovered the physical evidence. (Report and Recommendations, 13). The magistrate judge also found that Salahuddin's statements at the apartment fell within the public safety exception to *Miranda v. Arizona*, 384 U.S. 436 (1966). (Report and Recommendations, 17). In his objection, Salahuddin argued only the issue of his statements and failed to make an argument regarding the physical evidence recommendation. (Salahuddin's Objection, 1).

Salahuddin makes a generalized objection in the introductory sentences of his objection, but this is insufficient to prevent waiver. The sentences read: "On June 23, 2008, the magistrate judge recommended that Salahuddin's motions to suppress his statement and evidence be denied. Salahuddin now timely objects to this recommendation." (Salahuddin's Objection, 1). Salahuddin does not, however, mention the physical evidence recommendation anywhere else in the objection and makes no specific argument about the issue. A generalized objection is insufficient to trigger review by the district court. *United States v. O'Neill*, 27 F. Supp. 2d 1121,

-18-

1126 (E.D. Wis. 1998) ("Generalized objections, absent specific legal authority, do not invoke the district court's obligation to perform a *de novo* review of a magistrate's decision."). A general objecting statement, even if incorporating all previous arguments, does not suffice. *Id.* (citing *United States v. Molinaro*, 683 F. Supp. 205, 211 (E.D. Wis. 1988)). Salahuddin makes a brief physical evidence argument in his post-evidentiary hearing brief, but fails to do so in his actual objection. As a result, Salahuddin waives the physical evidence argument and the court adopts the magistrate's recommendation.

Regardless of waiver, Salahuddin would not prevail on his motion for suppression of physical evidence because the government met its burden of proving consent to the search. The court finds that Rose consented to a search of the apartment. Therefore, the physical evidence uncovered during the search may be properly admitted into evidence.

The Fourth Amendment probable cause and warrant requirements do not apply when an authorized party voluntarily consents to a search. *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006). The government bears the burden of proving by preponderance of the evidence that consent to search was freely and voluntarily given. *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006) (citing *United States v. Grap*, 403 F.3d 439, 442 (7th Cir. 2005)). The court determines whether consent was voluntary based on the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Salahuddin argues that Rose did not give consent to a search of the apartment based on her testimony that she was "positive" she was not asked and did not give consent. However, Rose earlier stated that she did not recall being asked for consent but that it was possible she was asked. In contrast to Rose's contradictory testimony, the officers' testimony was consistent. Detective Chang and Deputy Ford both testified that Deputy Ford asked Rose for consent to search and that Rose responded affirmatively.

As the magistrate judge points out, Rose had reason for a cloudy recollection of events on the day in question. First, the events occurred more than five years ago and she, unlike the officers, did not have the benefit of a contemporaneous, written report to refresh her recollection when testifying. Second, Rose was awoken to find a number of officers at the door peppering her with questions about her estranged husband. Indeed, Rose described herself as "coming out of a daze." (Tr. 128). In contrast, Deputy Ford had reason to ask for consent to search and take note of Rose's response. He headed up a team whose sole purpose at the apartment was locating a person they thought may be inside the residence.

Considering the totality of the circumstances, the government adequately proved that consent to search was given. Therefore, the court will deny the defendant's motion to suppress physical evidence based on Salahuddin's waiver of his argument, as well as Rose's consent to a search of the apartment.

## II. Statements

Salahuddin argues that the court should suppress the statements he made about the location of guns in the apartment because he had not yet been *Mirandized*. In response, the government asserts that the "public safety exception" applies to the case, excusing the officers' failure to give Salahuddin *Miranda* warnings prior to his custodial interrogation. The court finds that the public safety exception does not apply because there was insufficient danger to the public at the time of the questioning. Therefore, the court declines to accept the magistrate's recommendation and will grant Salahuddin's motion to suppress his statements.

Generally, suspects must be advised of certain constitutional rights before being subjected to custodial interrogation. *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). However, in *New York v. Quarles,* the Supreme Court recognized a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence. 467 U.S. 649, 655 (1984). In that case, a woman reported to police officers that she had just been raped, that the assailant was armed, and that he had just entered a supermarket. *Id.* at 649. After pursuing the suspect within the store, the officers apprehended him and discovered an empty shoulder holster. *Id.* The officers questioned the suspect about the location of his weapon prior to administering *Miranda* warnings. *Id.* The suspect indicated that his gun was hidden among some empty cartons within the store. *Id.* The officers retrieved the gun and then *Mirandized* the suspect. *Id.* The court held that both the

Case 2:05-cr-00145-LA    Filed 01/08/09    Page 21 of 31    Document 107

defendant's statement about the location of the gun and the gun itself were admissible, even though the defendant had not yet received *Miranda* warnings. *Id.* at 659-60.  The court reasoned that the officer needed an immediate answer to his question to "insure that further danger to the public did not result from the concealment of the gun in a public area." *Id.* at 657.  Also, as long as the gun remained concealed in the supermarket, "it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id.*

In the instant case, a suspected weapon in Salahuddin's private residence did not create sufficient danger to the public to admit the pre-*Miranda* statements he made while handcuffed, unclothed, and alone in his apartment.  The facts of this case closely approach the line dividing inadmissible pre-*Miranda* responses from admissible responses excused by public safety concerns.  However, the facts ultimately fall short.  The danger to the public in this case does not merit an exception to the Supreme Court's general requirement for *Miranda* warnings when a defendant is in custody and subject to interrogation. *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007).  Based on a consideration of all the circumstances, the court concludes that the public safety exception does not apply.  The relevant circumstances include the fact that the interrogation occurred in a private setting, the fact that officers were aware that other individuals to whom a concealed weapon posed a threat were not present, and the fact that the defendant was unclothed and secured in handcuffs at the time of questioning.

-22-

The court distinguishes the public safety exception applied in *Quarles* because the weapon in that case was concealed in a public area and posed a danger to the general public, while Salahuddin's suspected weapon was concealed in his private residence. The government argues that the location of Salahuddin's interrogation and suspected weapon is unimportant because the public safety exception was adopted to protect people and not places. However, this court disagrees that a "public" setting is wholly irrelevant to the "public safety exception." In *Quarles*, the defendant concealed his weapon in a supermarket, which was open to the public, where an unwary employee or customer might happen upon it. 467 U.S. at 649. In contrast, the suspected weapon in the instant case was located in a private residence requiring a key for entry. Therefore, the suspected weapon posed no danger to the general public, but rather posed only a danger to the arresting officers or the people residing within the apartment.

Along these lines, the government argues that the public safety exception applies because officers suspected the apartment contained an additional concealed weapon that constituted a danger to Rose and her two small children. The officers based this suspicion on their recovery of 9mm ammunition but no 9mm weapon the day before. An unknown firearm undoubtedly poses a grave danger in a home where children live. However, at the time the officers questioned Salahuddin, none of his family members were present to be placed in danger. The officers were well aware of this fact because they surveilled the apartment overnight and observed Rose and her children leave four hours prior to Salahuddin's arrest. The danger

-23-

posed to Salahuddin's absent wife and children could not equal the more immediate danger posed to members of the public in *Quarles*.

In addition, the officers' behavior is inconsistent with the government's claims of danger to Rose and her children. The government asserts that pre-*Miranda* warnings were necessary because of the danger to the Salahuddin family caused by a concealed weapon in the residence. However, the officers allowed the family to remain in the apartment with the suspected firearm overnight, without obtaining a search warrant to recover it. If the officers felt that an unaccounted-for 9mm weapon represented such a grave threat to the family that they must question Salahuddin about it prior to *Mirandizing* him, it seems incongruous that the officers took no action after becoming suspicious that such a weapon existed. The apparent lack of danger to family members when they were present undermines an argument for danger when they were absent. Unlike in *Quarles*, where the police asked about the location of the gun immediately upon seeing an empty holster, the police in the instant case asked about guns a full day after locating the 9mm ammunition that triggered their suspicion. The danger posed to Rose and her children does not merit application of the public safety exception.

The government also argues for application of the public safety exception because the suspected weapon posed a danger to the officers. The government argues that officers had reason to suspect an additional firearm was concealed in the apartment, based on the 9mm ammunition found the day before. However, the

-24-

officers never located a 9mm weapon. In fact, there is no evidence that any firearms, other than the two long guns, were ever recovered from the apartment.

Moreover, Salahuddin was unclothed and handcuffed when Deputy Ford questioned him about weapons. Even if the phantom 9mm weapon existed, at that point it could not pose a danger with such immediacy that the officers were placed in the "untenable position of having to consider...in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible." *Quarles*, 467 U.S. at 657-58. Salahuddin could neither employ nor conceal a firearm because he was handcuffed and wearing only his underwear during the questioning. The court disagrees that a handcuffed, nearly-naked man, alone in his apartment, poses a public safety threat necessitating a pre-*Miranda* question about weapons. If the public safety exception applies to these circumstances, the court is hard-pressed to come up with a situation in which it would not apply. If the only requirements for the exception are the presence of officers and the possibility of a weapon, the exception applies in the majority of arrests and ceases to be an *exception*.

The magistrate judge points out that an unidentified person may have entered the apartment, despite the surveillance, who could employ the concealed weapon and pose a threat to the officers. The government affirms this danger as justification for the public safety exception. However, the possible proximity of a second, unknown associate does not create logical support for the interrogation. If the

-25-

danger is posed by the potential presence of an unidentified individual, it does not follow that the danger would be best averted by asking "Are there any weapons in the apartment?" versus "Is there anyone else in the apartment?" The court disagrees that the possible presence of an unknown person, in an apartment that was under continuous surveillance for the last day, justifies use of the public safety exception. If the only requirements for the exception are the presence of officers and the mere potential that a second, unidentified person is present, the exception again applies in the majority of arrests and cannot be termed an *exception*. The danger posed to the officers does not merit the application of the public safety exception.

Finally, this court previously distinguished the instant case from the more immediate danger posed to the public in *Quarles*, which merited the use of the public safety exception. The court similarly distinguishes other Seventh Circuit case law following *Quarles*. Admittedly, the Seventh Circuit has applied the public safety exception to admit pre-*Miranda* questions about the presence of firearms. *See United States v. Edwards*, 885 F.2d 377 (7th Cir. 1989); *United States v. Kelly*, 991 F.2d 1308 (7th Cir. 1993); *United States v. Smith*, 210 Fed. Appx. 533 (7th Cir. 2006); *United States v. Simpson*, F.2d 845 (7th Cir. 1993). However, the court distinguishes these Seventh Circuit cases based on an evaluation of all the relevant circumstances. The considerations of the court in distinguishing the case law include: public settings for the questioning; danger posed by unsecured suspects; and the presence of innocent bystanders endangered by a concealed firearm.

-26-

In *Edwards*, the Seventh Circuit applied the public safety exception to a defendant's statement about weapons, asked while the defendant was handcuffed. 885 F.2d at 384. However, in *Edwards*, the court found an objectively reasonable need for the officer to protect the public because the arrest took place in the public parking lot of a restaurant. *Id.* at 384 n.4. In contrast, Salahuddin's arrest and questioning occurred in his private residence, obviating any need to protect the general public. In *Smith*, the court relied upon the public safety exception to admit the defendant's answer about the location of his gun given after officers handcuffed him and secured the room. 210 Fed. Appx. at 533-534. The defendant in *Smith* was a reportedly armed fugitive, hiding out in a hotel room, who resisted arrest and had to be tackled and tasered in the hotel hallway by officers. *Id.* at 534. In contrast, Salahuddin was in a private apartment, not a public area, and he did not resist arrest. Therefore, he posed less danger to the public or to the arresting officers. In *Kelly*, the court applied the public safety exception to a defendant's responses regarding weapons after an officer's consent search of the defendant's person turned up .22 cartridges. 991 F.2d at 1311, 1313. However, the defendant was a stopped motorist and was not under arrest or handcuffed at the time of the questioning. *Id.* at 1313. In contrast, Salahuddin was handcuffed and secure when questioned about his suspected weapon. Therefore, unlike in *Kelly*, Salahuddin could not potentially employ a firearm and endanger the officers. Finally, in *Simpson*, the court applied the public safety exception to a defendant's response about the location of his gun given to an officer investigating a domestic disturbance

call about the defendant threatening someone with a weapon. 974 F.2d at 846-47. In addition to the officer and the defendant, two women and two small children were also present inside the apartment during the questioning. *Id.* at 847. In contrast, Salahuddin's wife and children were not present in the apartment during his questioning and the officers were not responding to a call about his use of a firearm. Therefore, Salahuddin posed considerably less danger to officers or bystanders.

The facts of the cited Seventh Circuit cases warranted the public safety exception. However, under the totality of the circumstances, the instant case does not. Instead, the location of Salahuddin's questioning in a private residence, the lack of danger posed to others, and Salahuddin's handcuffed, unclothed and secured condition prevents application of the exception. As a result, Salahuddin's statements are not admissible evidence.

## III.   New Trial

The jury heard Salahuddin's inadmissible, pre-*Miranda* statements, which prejudiced him and requires that the court grant Salahuddin a new trial. During Salahuddin's jury trial, two of the prosecution's officer witnesses testified to Salahuddin's statements about the location of guns in the bedroom. Sergeant Stiff testified that Salahuddin responded to a question about the presence of firearms in the apartment by stating that there were two rifles, and gesturing with his head towards the bedroom where the long guns were found. (Tr. 92-93). Deputy Ford similarly testified that he asked Salahuddin whether there were any weapons in the residence, and Salahuddin answered that there were two rifles in the bedroom and

-28-

gestured with his head. (Tr. 116). This damaging testimony was relayed to the jury not just once, but was repeated by two different officers.

In addition to the testimony, both the prosecutor and defense counsel referenced Salahuddin's statements in closing arguments. The prosecution referred to Salahuddin's statements that there were two rifles in the bedroom as evidence that he had a sufficient link to the apartment to "possess" the firearms, despite the defense's argument that he did not live in the residence with his estranged wife. (Tr. 257-58). The defense also referred to Salahuddin's pre-*Miranda* responses during its closing argument. Defense counsel acknowledged that Salahuddin's statements were important to the prosecution's argument that Salahuddin had the intention to direct or control the firearms. (Tr. 263). However, the defense attempted to diminish the import of these statements by arguing that Rose may have informed Salahuddin the day before his arrest that officers had been at the apartment and confiscated two guns. (Tr. 263).

Finally, the trial judge made a vague reference to Salahuddin's statements during his jury instructions. The instruction referred generally to the defendant's statements made to Deputy Ford, which encompasses both the pre-*Miranda* statements made at the apartment and the post-*Miranda* statements made during the interview at the Criminal Investigation Division. The instructions directed the jury that they must decide whether Salahuddin made the alleged statements, and also to decide what weight the statements deserve. (Tr. 273). Further, the judge instructed members of the jury that, in making this determination, they must consider

Case 2:05-cr-00145-LA   Filed 01/08/09   Page 29 of 31   Document 107

all evidence surrounding the statements and the circumstances under which Salahuddin made the statements. (Tr. 273). Therefore, the court's instructions did nothing to diminish the impact or the jury's consideration of the statements.

The jury heard Salahuddin's inadmissible, pre-*Miranda* statements from two officer witnesses and from both attorneys. Not only did the jury hear the statements, but they were referenced at a time when they would be fresh in jury members' minds – during closing arguments. The jury instructions advised the jury to consider Salahuddin's statements, if members determined them to be credible and significant. The content of the statements potentially impacted the jury's verdict. A reasonable juror could take into account Salahuddin's knowledge about the existence and exact location of the guns in determining that he "possessed" the firearms as a convicted felon. As a result, the court can easily conclude that the jury's awareness of Salahuddin's pre-*Miranda* statements during his arrest prejudiced him at his trial.

Therefore, in light of the defendant's waiver of his physical evidence argument and the inapplicability of the public safety exception, the court denies Salahuddin's motion to suppress physical evidence and grants his motion to suppress statements. Consequently, as directed by the Seventh Circuit, the grant of the motion to suppress statements requires the court to also vacate the jury verdict and grant the defendant a new trial, pursuant to Fed. R. Civ. P. 60(b).

## IV.  Recusal Motion

There remains but one additional matter – a recusal motion filed by the government. The motion followed a joint meeting between the court and counsel for

the parties as more fully detailed in an earlier footnote.  To be sure, on its face the motion represents nothing more than an ill-considered, poorly-disguised, preemptive collateral attack, albeit through the convenience of forum shopping, on the wisdom of the court's decision announced today.  The motion is denied.

Accordingly,

**IT IS ORDERED** that Magistrate Goodstein's recommendations be and the same are hereby **ADOPTED IN PART**;

**IT IS FURTHER ORDERED** that Salahuddin's motion to suppress physical evidence (Docket #35) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Salahuddin's motion to suppress statements (Docket #36) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the jury verdict and judgment of conviction be and the same are hereby **VACATED** and the defendant be and he is herewith **GRANTED A NEW TRIAL**, and

**IT IS FURTHER ORDERED** that the government's recusal motion (Docket #105) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 8th day of January, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge