# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA
      **Plaintiff,**

    **v.**                             **Case No. 05-CR-145**

RASHID SALAHUDDIN
      **Defendant.**

## DECISION AND ORDER

### I. BACKGROUND

The government charged defendant Rashid Salahuddin, formerly known as Willie Gray, with possessing firearms as a felon, contrary to 18 U.S.C. § 922(g)(1). (R. 1) Defendant initially pleaded guilty (R. 11), but after the parties discovered that defendant likely qualified as an armed career criminal under 18 U.S.C. § 924(e), triggering a 15-year mandatory minimum sentence, Judge Clevert permitted defendant to withdraw his plea, then recused himself from the case (R. 26). Defendant thereafter attempted to litigate a motion to suppress physical evidence and a motion to suppress statements. In the first motion, defendant sought suppression of the firearms on the grounds that officers searched and seized the guns from his wife's residence without her consent. (R. 35.) The second motion sought suppression of statements defendant made at the time of his arrest and later at the police station based on Miranda violations. (R. 36.) Judge Randa, to whom the case had been reassigned, concluded that defendant failed to establish good cause for filing the motions after the deadline originally set in the case and thus refused to consider them. (R. 49.)

The case proceeded to trial, the jury convicted, and Judge Randa sentenced defendant

to 180 months in prison as an armed career criminal. The Seventh Circuit reversed, holding

that Judge Randa erred in refusing to permit defendant to litigate the suppression motions.

The court concluded:

> On remand, the district court must permit the defendant to litigate his
> suppression motion. If the district court grants the motion, it must grant the
> defendant a new trial in order to permit a jury to determine the question of guilt
> or innocence in the absence of the suppressed evidence. If the court denies the
> motion to suppress, it shall reinstate its judgment, and Mr. Salahuddin may seek,
> if he wishes, further review in this court.

United States v. Salahuddin, 509 F.3d 858, 864 (7th Cir. 2007).

On remand, Magistrate Judge Goodstein held an evidentiary hearing on the motions.

Summarized, the law enforcement witnesses indicated that they traveled to defendant's

(estranged) wife's apartment in search of defendant, the subject of an arrest warrant. The

officers testified that defendant's wife, Rose, denied that defendant was there but nevertheless

permitted them to enter to look for him. During their search, officers discovered two firearms

and some ammunition in a bedroom closet. Rose testified that the officers entered without her

permission.

Based on suspicions that defendant lived in the apartment, the officers testified that they

set up surveillance and the following day saw defendant enter using a key. The officers forced

entry and arrested defendant. One of the officers asked defendant if there were any weapons

in the house, and defendant stated that there were two guns in the bedroom closet. The

officers did not provide Miranda warnings before asking this question. At the police station,

officers provided warnings, and defendant agreed to answer a few questions but then

terminated the interview.

Magistrate Judge Goodstein recommended that both motions be denied. Regarding the

2

motion to suppress physical evidence, he credited the officers' testimony and concluded that

Rose consented to the entry and search pursuant to which the officers found the two guns. (R.

101 at 11-13.)  Regarding the motion to suppress statements, he concluded that the "public

safety" exception of New York v. Quarles, 467 U.S. 649 (1984) applied to the un-Mirandized

statement defendant made at the time of his arrest.[1]  (R. 101 at 13-17.)

Defendant objected to the recommendation only as it pertained to the motion to

suppress his statement at the time of arrest.  By this point, Judge Stadtmueller had been

assigned to the case, and he denied the motion to suppress physical evidence but suppressed

the statement made at the time of arrest, finding Quarles inapplicable.  (R. 107.)  The

government moved for Judge Stadtmueller's recusal and, after he denied that request,

petitioned for a writ of mandamus seeking his removal from the case, which the court of

appeals granted.  In re United States, 572 F.3d 301 (7th Cir. 2009).  The appellate court also

vacated Judge Stadtmueller's order on the motions to suppress.  Id. at 312.

On return to the district court, the case was re-assigned to me, and I received briefs from

the parties on the pending motions.  The government argues that I should adopt Magistrate

Judge Goodstein's recommendation and deny both motions.  In the alternative, even if I grant

the motion to suppress defendant's statement made at the time of arrest, the government

contends that a new trial is not warranted because admission of this statement was harmless.

The government notes that the court of appeals in its 2007 decision ordered a new trial if the

district court granted "the motion" – singular – but contends that the court did not address

whether a new trial would be warranted if defendant lost on two of the three suppression issues

---

[1]After the hearing, defendant abandoned any challenge his later statements at the police
station.

3

he presented. Thus, even if I agree with Judge Stadtmueller on the <u>Quarles</u> issue, the government contends that I should not order a new trial. Defendant argues that I should reject the recommendation and grant the motion to suppress his statement.[2] He further argues that, if I do so, a new trial is required by the 2007 appellate mandate. Finally, he contends that his statement on arrest figured prominently in the trial, and that its admission cannot be considered harmless.

My review of the recommendation on the motions is de novo. Fed. R. Crim. P. 59(b)(3). De novo review does not mean that the district judge must conduct a de novo evidentiary hearing. <u>See</u> <u>United States v. Raddatz</u>, 447 U.S. 667, 673-76 (1980). Neither side requests a new hearing, and I find the record made before the magistrate judge sufficient for me to rule. For the reasons that follow, I adopt the recommendation as to the motion to suppress physical evidence, but grant the motion to suppress defendant's statement at the time of arrest.[3] I also grant defendant a new trial.

## II. FACTS

Because the only issue before me is whether to suppress defendant's statement at the time of arrest, I focus on the facts pertinent to that issue. Deputy Sheriff James Ford, a member of the warrant squad, testified that in January of 2003 he was tasked with attempting

---

[2]Consistent with his earlier objections, defendant presents no argument on the motion to suppress physical evidence. Nor does he seek suppression of his statements made at the police station.

[3]Although the magistrate judge's recommendation on the motion to suppress physical evidence is not self-executing, and I must enter an order formally denying the motion, by failing to timely object to the recommendation on that motion defendant has waived the right to further review. Fed. R. Crim. P. 59(b)(2). For the reasons stated by the magistrate judge, I will deny the motion to suppress physical evidence and do not discuss it further.

to locate defendant, wanted on a felony warrant. (Apr. 30, 2008 Evid. Hr'g Tr. at 7-8.) Ford discovered the address of defendant's wife, 7510 West Thurston Avenue, Apartment 1, listed in booking information from one of defendant's previous arrests. On January 13 at about 4:30 p.m., Ford and three other members of his team – Detectives Scott Stiff, Greg Zimmer and Luke Chang – traveled to that address – a multi-unit building with a locked common entrance and individual apartments within – to locate defendant. (Id. at 8-9; 36.) Ford rang the doorbell, but no one answered. He then called a phone number he had associated with the apartment, and a woman, later identified as defendant's wife, Rose, answered. Ford identified himself and asked her to come to the door. (Id. at 10.) Rose came to the door, and Ford explained why the officers were there. Rose denied that defendant was present but agreed to allow the officers to come inside and take a look around. (Id. at 11-12; 41; 72.)

The officers did not locate defendant, but Chang did find two loaded long guns, along with a plastic bag containing various caliber ammunition, including 9 mm, in a bedroom closet. The officers also located male clothing and mail addressed to defendant in the room. Rose and her children were the only persons present. Rose said that the guns belonged to defendant, and that he used to live at the residence but they were currently separated. (Id. at 13-16; 73-75; 102; 110.) The officers seized the two long guns and asked for permission to search for other weapons based on the discovery of the ammunition, but Rose declined.[4] (Id. at 16-17; 66.)

Based on the discovery of the firearms and personal effects that apparently belonged

---

[4]Ford testified that based on Rose's statement that she knew nothing about the two guns Chang found, he believed the presence of other possible weapons created an unsafe situation for the children. (Id. at 60.)

5

to defendant, Ford suspected that defendant still lived there, so he and his team set up surveillance of the residence. (Id. at 17; 78.) At about 7:00 a.m. the following morning the officers observed Rose and the children leave. Defendant arrived at about 10:30 a.m. and entered using a key.[5] (Id. at 18-20; 78.) The officers gathered and about ½ hour later made entry into the apartment, breaching the outer and inner doors after receiving no response to their knocks. (Id. at 21-23; 112.) The officers announced their presence inside the apartment, and defendant responded that he was in the back bedroom and not armed. The officers ordered defendant to show his hands and come out, and he complied. (Id. at 23; 45; 113.) Ford handcuffed defendant and took him into custody. He then asked "if there were other weapons in the house." (Id. at 24; 47-49.) Ford testified that he asked the question based on the discovery of the 9 mm rounds the previous day, which suggested that there might be other weapons. Defendant responded "that there were two guns in a closet in a bedroom," and motioned with his head to the bedroom from which the officers had removed the guns the previous day. (Id. at 24; 81; 113.) Ford admitted that he did not provide Miranda warnings before asking the question, explaining that he asked the question based on officer safety. He indicated that he was not attempting to take a statement from defendant at that point. (Id. at 25; 49.)

As defendant was clad only in his underwear, the officers gathered some clothing for him and removed him from the residence. (Id. at 25.) After taking defendant into custody, the officers conducted a protective sweep to make sure no one else was present but did not conduct a search for more weapons. (Id.) The officers took defendant downtown, provided

---

[5]Stiff testified that he and a Detective Dan Carter, who had joined the surveillance team, observed Rose leave and defendant arrive. (Id. at 111-12.)

<u>Miranda</u> warnings, then asked him some questions about the incident.  (<u>Id.</u> at 26-27.)[6]

## III.  DISCUSSION

**A.      The Motion**

### 1.       Applicable Legal Standards

To protect an individual's right against self-incrimination, a suspect must be advised of certain rights prior to being subjected to custodial interrogation.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  To implicate <u>Miranda</u>, the suspect must be both "in custody" and subject to "interrogation."  <u>United States v. Yusuff</u>, 96 F.3d 982, 987 (7th Cir. 1996).  In the present case, it is undisputed that defendant was in custody at the time Ford asked him if there were any weapons in the house, that this direct question constitutes interrogation,[7] and that the officers did not provide <u>Miranda</u> warnings before asking the question.  The only dispute is whether the so-called public safety exception to <u>Miranda</u> adopted in <u>New York v. Quarles</u> applies.

In <u>Quarles</u>, two officers were approached by a woman who stated that she had just been raped, providing a description of the suspect.  She further stated that the man had just entered a nearby supermarket and was carrying a gun.  The officers proceeded to the supermarket and spotted the suspect, who turned and ran toward the rear of the store.  One of the officers, Kraft,

---

[6]As indicated earlier, defendant no longer seeks suppression of these <u>Mirandized</u> statements.

[7]Earlier in the proceedings, the government debated whether Ford's question amounted to interrogation.  It has since accepted that it did.  (<u>See</u> Govt.'s Resp. to Def.'s Objection [R. 103] at 9 n.5.)  Although it is unnecessary to address the issue in depth, I note that the magistrate judge considered whether Ford's question was likely to elicit an incriminating response under <u>Innis</u>.  (Recommendation [R. 101] at 14, concluding that it was.)  However, the <u>Innis</u> test does not apply where, as here, the officer asks a direct question.  <u>See</u> <u>Smiley v. Thurmer</u>, 542 F.3d 574, 582 (7th Cir. 2008) ("[A]s the district court explained, <u>Innis</u> does nothing more than define when police practices, <u>other than express questioning</u>, constitute interrogation.").

7

pursued and ordered him to stop. Additional officers arrived on the scene, but Kraft was the

first to reach the suspect. Kraft frisked the man and discovered that he was wearing a shoulder

holster, which was then empty. After handcuffing him, Kraft asked the man where the gun was,

and the suspect nodded in the direction of some empty cartons and responded, "the gun is

over there." Kraft then retrieved a loaded .38-caliber revolver from one of the cartons, formally

placed respondent under arrest, and read him his Miranda rights from a printed card. The

suspect then made further incriminating statements. 467 U.S. at 651-52.

In his subsequent prosecution for criminal possession of a weapon, the state courts

excluded the statement, "the gun is over there," and the gun because the officer had not

provided the Miranda warnings before asking where the gun was located. The Supreme Court

reversed and held that "on these facts there is a 'public safety' exception to the requirement

that Miranda warnings be given before a suspect's answers may be admitted into evidence."

Id. at 655. The Court explained:

> The police in this case, in the very act of apprehending a suspect, were
> confronted with the immediate necessity of ascertaining the whereabouts of a
> gun which they had every reason to believe the suspect had just removed from
> his empty holster and discarded in the supermarket. So long as the gun was
> concealed somewhere in the supermarket, with its actual whereabouts unknown,
> it obviously posed more than one danger to the public safety: an accomplice
> might make use of it, a customer or employee might later come upon it.

> In such a situation, if the police are required to recite the familiar Miranda
> warnings before asking the whereabouts of the gun, suspects in Quarles' position
> might well be deterred from responding. Procedural safeguards which deter a
> suspect from responding were deemed acceptable in Miranda in order to protect
> the Fifth Amendment privilege; when the primary social cost of those added
> protections is the possibility of fewer convictions, the Miranda majority was willing
> to bear that cost. Here, had Miranda warnings deterred Quarles from responding
> to Officer Kraft's question about the whereabouts of the gun, the cost would have
> been something more than merely the failure to obtain evidence useful in
> convicting Quarles. Officer Kraft needed an answer to his question not simply
> to make his case against Quarles but to insure that further danger to the public

8

did not result from the concealment of the gun in a public area.

> We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

Id. at 657-58.

The Court acknowledged that this "narrow exception" to the Miranda rule lessened the

desirable clarity of that rule. Id. at 658.

> But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process. The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

Id. at 658-59.

Thus, under Quarles, the police may question an arrestee without first providing Miranda

warnings if the police reasonably believe that doing so will protect them or the public from an

immediate danger, such as a nearby concealed weapon. See, e.g., Quarles, 467 U.S. at 659;

United States v. Kelly, 991 F.2d 1308, 1313 (7th Cir. 1993); United States v. Edwards, 885

F.2d 377, 384 (7th Cir. 1989). Questions fall within the exception when they relate to an

objectively reasonable need to protect the police or the public from immediate danger, rather

than a design to elicit testimonial evidence from the suspect. See Quarles, 467 U.S. at 659 &

n.8. When arresting officers reasonably believe that a suspect has a concealed weapon near

9

the place of arrest, they may ask about the weapon to protect themselves or the public even after the suspect has been handcuffed and searched. See, e.g., Quarles, 467 U.S. at 652; United States v. Knox, 950 F.2d 516, 517 & 519 (8th Cir. 1991); Edwards, 885 F.2d at 380 & 384. This is so because the exception is based not only on the potential risk posed by the suspect but also on the concern that others, such as an accomplice or member of the public might happen upon the gun. See Quarles, 467 U.S. at 657. Nevertheless, the exception is a "narrow one," applicable only when the exigencies of the situation confronting the officers justify its application. See id. at 658-59. As an exception to the general rule of Miranda, it must be construed narrowly. United States v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994). Finally, the court's inquiry is objective and does not depend on the subjective motivation of the officers involved. Quarles, 467 U.S. at 656.

## 2. Analysis

I cannot conclude that the exception applies here. The encounter occurred in a private apartment, not a public place, where others might happen upon the missing gun.[8] The officers had, through their surveillance, confirmed that Rose and the children were gone and that no one else had entered the apartment. Finally, defendant, clad only in his underwear, had already been handcuffed and neutralized at the time Ford asked about guns. Numerous officers participated in the arrest, fanning out through the apartment. On these facts, I cannot conclude that any exigency, whether it be danger to the officers from some unknown

---

[8]It is worth noting that the officers based their belief that the apartment contained a missing third gun on the presence of ammunition that did not match the two long guns previously seized. It is questionable whether this is sufficient to create a reasonable belief that another gun was secreted within the apartment. This is not a case like Quarles, where a witness saw the defendant with a gun, and the defendant possessed an empty holster when arrested.

10

accomplice, or to defendant's children based on the presence of a missing gun, required Ford

to question defendant without the provision of warnings.

Courts have rejected application of the public safety exception under such

circumstances. In United States v. Brathwaite, 458 F.3d 376 (5th Cir. 2006), the police

executed a search warrant at the defendant's residence, forcing entry when no one answered

the door. The officers conducted sweeps of the house, locating the defendant's girlfriend

hiding under a bed, and handcuffed her. The officers then found the defendant sitting in his

running vehicle in the driveway, removed him from the car and handcuffed him. One of the

officers came out of the house and asked, "where are the guns, where are the rest of the guns

in the house?" Id. at 378. Another officer asked, "Are there any guns in the house?" The

defendant initially said no, but on being asked again replied that he was keeping a pistol for a

friend, and that it was on top of the washing machine. He also stated that he owned a shotgun.

The officers located a .45 caliber pistol above the washing machine, as well as a 20 gauge

shotgun in the master bedroom and various ammunition, and the government subsequently

indicted him for possession of firearms as a felon. Id.

The defendant moved to suppress the statements he made in the driveway based on

a Miranda violation. The government conceded that the defendant made the statement while

in custody and prior to the provision of warnings, but argued that suppression was unwarranted

under Quarles. Id. at 382. The court rejected the argument, stating:

> The public safety exception to Miranda allows the admission as evidence of
> statements given by a defendant before being given Miranda warnings when "a
> situation posing a threat to the public safety" exists. New York v. Quarles, 467
> U.S. 649, 655-60 (1984). This exception is a "narrow exception" which in each
> case is "circumscribed by the exigency which justifies it." Id. at 658. In Quarles,
> the police "had every reason to believe the suspect had just removed [a gun]
> from his empty holster and discarded it in [a] supermarket," posing dangers to the

11

public safety such as an accomplice making use of it or a civilian finding it. Id. at 657. "When the danger inherent in a confrontation has passed, so has the basis for the [public safety] exception." Fleming v. Collins, 954 F.2d 1109, 1114 (5th Cir. 1992) (en banc).

It is uncontested that at the time of questioning, the agents had performed two sweeps of the house and had both occupants of the house in handcuffs. The agents were in the process of executing the search warrant. Furthermore, the government's contention that a public safety concern existed in that a member of the public, including school children, might find a gun outside the house is undermined by the questioning itself-Agent Bass testified that he asked Brathwaite repeatedly "Are there any guns in the house?", and never testified as to asking him about any guns located anywhere else. Because sweeps had been done, the occupants were handcuffed, and the immediacy of the situation had passed, the government's proposition that the possibility of guns located within Brathwaite's private residence provided a threat to the public is likewise unavailing. The public did not have access to Brathwaite's private residence, which was under the full control of the agents at the time of questioning. See United States v. Raborn, 872 F.2d 589, 595 (5th Cir. 1989) (dictum) ("Unlike . . . Quarles, . . . when the gun was hidden in a place to which the public had access, [the] truck, where the ... officers believed the gun to be, had already been seized and only the . . . officers had access to [it]. It is difficult therefore, to find that the public-safety exception applies."). Thus, we do not find such an exigency necessary to apply the narrow confines of the public safety exception to the case at hand.

Id. at 382 n.8.

Similarly, in United States v. Mobley, agents executing arrest and search warrants secured the defendant, who answered the door naked, conducted a sweep, determining that no others were present, then asked the defendant whether he had any weapons in the apartment.[9] In response, the defendant stated that he had a gun in the bedroom closet and showed the agents to it. 40 F.3d at 690-91. The government argued for admission of the statement under Quarles, but the court rejected the argument. The court first noted that,

_____

[9]The agent in Mobley provided Miranda warnings before asking about weapons, and the defendant invoked his right to counsel. The court first concluded that the public safety exception could apply to excuse a violation of Edwards, but then held the exception inapplicable on the facts presented.

12

absent other information, a suspicion that weapons are present in a particular setting is not

enough, as a general matter, to demonstrate an objectively reasonable concern for immediate

danger to police or public.  Id. at 693 n.2.  The court continued:

> No such danger is apparent in the present case.  As noted, Mobley was
> encountered naked; by the time he was arrested, the FBI already had made a
> security sweep of his premises, and they had found that he was the sole
> individual present, and that the apartment was a residence for Mobley alone.  As
> he was being led away, an FBI agent asked him whether there were any
> weapons present.  These facts contrast sharply with those of Quarles, and we
> are persuaded that they fall without, rather than within, the exception Quarles
> recognized.  There is nothing that separates these facts from those of an
> ordinary and routine arrest scenario.  There was no explanation at any time as
> to what extraordinary circumstances prompted this question, and we must
> conclude that there were none.  Although we believe that the public safety
> exception is a valid and completely warranted exception to the Miranda and
> Edwards rules, we are persuaded that there was no demonstration of an
> "immediate need" that would validate protection under the Quarles exception in
> this instance.  Absent an objectively reasonable concern for immediate danger
> to police or public, we must follow the rule, not the exception.

Id. at 693.[10]

Finally, in United States v. Barnes, No. 05 CR 134, 2005 WL 1899502 (E.D. Pa. Aug.

8, 2005), officers executing a search warrant secured and handcuffed the defendant and his

girlfriend upon entering the residence, then asked the defendant if he had illegal contraband

or anything that would harm the police or himself inside the property.  The defendant

responded that he had a gun and "some product" in the basement in a safe.  Id. at *2.  The

government argued that the public safety exception permitted introduction of this un-warned

statement, but the court disagreed:

---

[10]To the extent that the officers in Brathwaite and Mobley may have conducted more complete sweeps of the residences before questioning the defendants, the officers in the present case had the advantage of continuous surveillance to ensure that no others were present. Thus, if anything, the argument for suppression in the present case is stronger.

13

Under these circumstances, the Court concludes that there was no objectively reasonable need for the officers to ask Defendant whether he had illegal contraband or weapons in order to protect the police or the public from an immediate danger. Defendant was secured, handcuffed, and seated on a couch when Officer Bogan questioned him, while his girlfriend Ativa Gardner had similarly been secured and escorted upstairs. Neither Defendant nor Ativa Gardner struggled, were combative, or attempted in any other way to evade arrest or threaten the officers and others. Moreover, there is no evidence to suggest that the agents believed Defendant was carrying a weapon or had access to one. The Court, therefore, finds that this was not a situation in which the police officers could objectively and reasonably conclude that the Defendant presented a danger to themselves or others.

Id. at *3; see also Raborn, 872 F.2d at 595 ("Unlike the situation in Quarles, however, when the gun was hidden in a place to which the public had access, Raborn's truck, where the police officers believed the gun to be, had already been seized and only the police officers had access to the truck. It is difficult therefore, to find that the public-safety exception applies.").

The cases cited by the government are distinguishable. In Quarles, as discussed above, the officers had good reason to believe that the defendant had stashed a gun inside a grocery store, endangering shoppers and employees. Here, at the time of the statement, the police suspected the presence of an additional gun in an otherwise unoccupied private residence.

In United States v. Simpson, 974 F.2d 845 (7th Cir. 1992), the police responded to an apartment regarding a domestic disturbance involving a gun. The officers observed two women and two small children inside the apartment, and the woman who called the police told one of the officers that the defendant left with the gun in his hand. When the defendant returned, he no longer had the gun. One of the officers asked the defendant if he owned any weapons, and he answered that the only gun he owned was behind the couch. The officers then retrieved a firearm from behind the couch. Under these circumstances, the court found it appropriate for the officer to ask the suspect about his guns. Id. at 846-47. In the present

14

case, at the time Ford asked defendant about the guns, no women or children were present, defendant was handcuffed, and the officers had no information that he had threatened anyone with a weapon.[11]

In United States v. Newton, 369 F.3d 659 (2d Cir. 2004), although (as in this case) the officers questioned the handcuffed suspect within his private residence, the court found that "the presence of three persons in the apartment in addition to Newton, the reported hostility among these individuals, and the possibility that such hostility could turn against law enforcement officers combined to support an objective belief that even with Newton handcuffed, the unlocated gun presented a deadly risk to everyone on the premises." Id. at 678 (footnote omitted). In the present case, no others were present, and the record contains no evidence of any similarly explosive situation.

Finally, in United States v. DeSantis, 870 F.2d 536 (9th Cir. 1989), the defendant, arrested in his home on a warrant, asked to go into his bedroom to change his clothes before the agents took him away. One of the agents asked whether there were any weapons in the bedroom, in response to which the defendant disclosed a gun. Id. at 537. Under those facts, where the unrestrained defendant asked to enter another room, the court found that legitimate officer safety concerns supported the question. Id. at 539.[12]

---

[11]Likewise distinguishable are the other published Seventh Circuit cases applying the exception. In Kelly, the court determined that the defendant was not in custody when questioned after a traffic stop, arguably making the Quarles analysis unnecessary. 991 F.2d at 1312-13. In any event, the officer asked about the presence of guns in that case only after the defendant, who had not yet been handcuffed, voluntarily produced .22 caliber cartridges. Id. In Edwards, officers arrested the defendant for drug trafficking, an offense typically associated with weapon possession, in a public parking lot. 885 F.2d at 384.

[12]As in Newton, the DeSantis court concluded that the public safety exception could apply after a suspect invoked his rights. Id. at 541.

15

The government's other arguments are unpersuasive. The government notes that Ford asked no additional, investigatory questions until after Miranda warnings had been given. This may support the notion that Ford did not intend to violate Miranda, but as noted above, an officer's subjective motivation is irrelevant. The government also notes that the exception may apply even when the suspect is handcuffed, e.g., Quarles, 467 U.S. at 655, or when the encounter occurs in a private residence, e.g., Newton, 369 F.3d at 663; Simpson, 974 F.2d at 846; DeSantis, 870 F.2d at 539. I agree that these facts do not automatically disallow application of the exception, but they are surely relevant in evaluating the nature and seriousness of the exigency.[13]

The government states that the officers had reason to believe that a 9 mm pistol might be in the apartment to which defendant's wife and children would be returning.[14] But this possibility created no immediate danger and thus created no exigency justifying invocation of the Quarles exception. Nothing prevented the officers from sealing off the apartment until a warrant could be obtained, or from warning Rose (who claimed ignorance when shown the two

_____

[13]As discussed above, the private residence cases typically involve multiple occupants or an unrestrained defendant, factors missing in this case. See also United States v. Mendoza, 333 F. Supp. 2d 1155, 1161-62 (D. Utah 2004) (applying the exception where others were present and may have gained access to the weapons in the defendant's house, endangering the officers). As I discuss further below, in the present case, the record contains no evidence from which the officers could reasonably have concluded that unknown others were inside the apartment and might access some other gun. Ford testified that his concern was Rose's children, whom the officers knew were not present at the time.

[14]In its post-hearing brief, the government stated that defendant might also be returning to the apartment and thus could access the gun. (R. 99 at 12.) That seems most unlikely given the arrest warrant.

16

long guns) about the presence of other possible weapons so she could look out for her kids.[15]

This argument based on concern for the children also rings somewhat hollow given that the officers left Rose and her children in the apartment with the possible third gun on the afternoon of January 13, thus allowing a claimed emergency situation to linger overnight. Nor does the record support an argument that the missing third gun posed a risk to the officers, who had a cooperative defendant, clad only in his underwear, handcuffed in an otherwise unoccupied apartment.

The magistrate judge and the government speculate that someone else may have entered the unit, creating a risk that s/he might get the gun, but the record contains no support for that. Detective Chang testified without contradiction that the warrant squad "performed surveillance through the evening and into the early morning on that particular residence." (Tr. at 78.)[16] None of the officers testified that anyone other than Rose and her children, and defendant entered or exited the residence between the afternoon of January 13 and defendant's arrest on January 14. Nor did the officers ask defendant about the presence of

---

[15]In United States v. Bater, 830 F. Supp. 28 (D. Mass. 1993), the court rejected a similar child-safety argument. In that case, young children lived in the residence from which the gun had been seized. The court nevertheless found the public safety exception inapplicable. "In the instant case, the weapon was in a dresser drawer in a private apartment. To apply the exception in the instant case would allow the police to seize dangerous items – weapons or prescription medicine, for example – any time the owners of those items were not home but young children were. Concern for the well being of the children is, of course, appropriate, but there are no grounds for asserting that those who own potentially dangerous items risk their seizure whenever they leave the house." Id. at 38 n.6.

[16]The magistrate judge and the government question whether the surveillance was continuous, but the testimony was that it commenced the evening of January 13 and continued until defendant's arrest on January 14. (Tr. at 17-18; 78.) The government made no effort to demonstrate any gaps in the surveillance during the hearing, and none of the officers testified that they believed another person was within the apartment.

17

others.  Finally, the officers had the apartment well covered at the time Ford questioned defendant about weapons.  Chang testified that he searched another portion of the apartment, then returned to the front to rejoin his colleagues after defendant emerged.  (Tr. at 80-81.)  Nor, without some support in the record, can I apply the exception based on speculation that someone may have entered Apartment 1 from another unit within the building.

The government makes much of the fact that defendant was a felony escapee on a firearm conviction, which increased the danger posed by the unaccounted-for firearm.  But defendant cooperated with the arresting officers and had been totally neutralized at the time Ford questioned him.  As the Mobley court stated, absent some other indication of danger, suspicion that weapons are present in a particular setting is not enough to demonstrate an objectively reasonable concern for immediate danger to the police or the public.  Id. at 693 n.2.

For all of these reasons, I find the public safety exception inapplicable.  Defendant's statement at the time of arrest must accordingly be suppressed under Miranda.

## B.    The Remedy

For two reasons, I will grant defendant a new trial.  First, nothing in the appellate mandate suggests that the district court should on remand independently evaluate the effect of the suppressed evidence and then determine whether a new trial was warranted.  The court of appeals instead stated that the district court "must grant the defendant a new trial in order to permit a jury to determine the question of guilt or innocence in the absence of the suppressed evidence."  509 F.3d at 864 (emphasis added).[17]

---

[17]I note that the court of appeals, earlier in its 2007 opinion, referred to defendant's "motions to suppress evidence and statements."  509 F.3d at 860.  Thus, the court was aware that defendant had filed two motions.  It nevertheless provided no indiction that the remedy would be different if the district court granted one as opposed to both motions.

18

Second, even if such an inquiry were appropriate, I cannot conclude that admission of defendant's statement on arrest was harmless. The government proceeded on a constructive possession theory in this case. As noted above, defendant was not present on January 13 when the officers seized the two guns forming the basis for the charge. Thus, his now-suppressed statement acknowledging the presence of the two guns in the bedroom closet constituted significant evidence of guilt. See, e.g., United States v. Alanis, 265 F.3d 576, 592 (7th Cir. 2001) (discussing the requirements of knowledge of the firearm and an intent to exercise dominion and control in a constructive possession case); United States v. Terry, 911 F.2d 272, 278 (9th Cir. 1990) ("In the more difficult situation where the premises are shared by more than one person, the Ninth Circuit has found that if a party has knowledge of the weapon and both the power and the intention to exercise dominion and control over it, then he has constructive possession."). During the trial, Stiff and Ford both testified as to the statement (Trial Tr. at 93; 116 ), and the parties both discussed it in closing arguments (Id. at 258; 263).

The government argues that defendant's statement on arrest was, in substance, repeated during his later Mirandized statement. But the trial transcript reveals that the later statement differed significantly from the now-suppressed statement. Regarding the later Mirandized statement, Ford testified: "I made mention to him that rifles were discovered at the residence, and he said yes, a 16 gauge. Or something to that effect." (Id. at 118.) Thus, during this statement Ford made the first mention of the seized guns, and neither of the guns the officers seized was a 16 gauge, which tends to cast some doubt on defendant's knowledge of what was there. Further, defendant told Ford at that time that the guns "belonged to his wife." (Id. at 119.) Thus, the later, Mirandized statement could be viewed as exculpatory.

To be sure, the government possesses additional evidence, as it discusses in its brief.

19

But given the nature of the now-suppressed statement, I cannot conclude that the other evidence is so overwhelming as to warrant denial of a new trial.

### IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation on the motion to suppress physical evidence is adopted, and the motion to suppress physical evidence (R. 35) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to suppress statements (R. 36) is **GRANTED** as stated herein.

**IT IS FURTHER ORDERED** that defendant is **GRANTED** a new trial in accordance with the Seventh Circuit's mandate.

**FINALLY, IT IS ORDERED** that the **STATUS** previously set for October 30, 2009 is **ADJOURNED** to **Tuesday, November 3, 2009, at 3:00 p.m.** The court will address further scheduling of the matter at that time.

Dated at Milwaukee, Wisconsin, this 23rd day of October, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

20